IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| SHARON HARNEY, | § | |
|     PLAINTIFF, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:12-CV-515-Y |
| | § | |
| CAROLYN W. COLVIN, | § | |
| ACTING COMMISSIONER | § | |
| OF SOCIAL SECURITY, | § | |
|     DEFENDANT. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE
AND
NOTICE AND ORDER**

This case was referred to the United States Magistrate Judge pursuant to the provisions of

Title 28, United States Code, Section 636(b). The Findings, Conclusions, and Recommendation

of the United States Magistrate Judge are as follows:

**FINDINGS AND CONCLUSIONS**

**I. STATEMENT OF THE CASE**

Plaintiff Sharon Harney ("Harney") filed this action pursuant to Sections 405(g) and

1383(c)(3) of Title 42 of the United States Code for judicial review of a final decision of the

Commissioner of Social Security denying her claim for supplemental security income ("SSI")

under Title XVI of the Social Security Act ("SSA"). Harney applied for SSI on November 10,

2008, alleging that her disability began on November 9, 2008. (Tr. 18.)

After her application for benefits was denied initially and on reconsideration, Harney

requested a hearing before an administrative law judge ("ALJ"). (Tr. 18, 98–100.) The ALJ

held a video hearing on November 23, 2009, and issued an unfavorable decision on March 22,

2010. (Tr. 15–30.) The Appeals Council initially denied Harney's request for review on March

25, 2011, and Harney requested a reopening. (Tr. 9–12.) On May 24, 2012, the Appeals Council

set aside its earlier action to consider additional information but denied the claim again, leaving the ALJ's decision as the final decision of the Commissioner in Harney's case.  (Tr. 1–5.) Harney subsequently filed this civil action seeking review of the ALJ's decision.

## II. STANDARD OF REVIEW

SSI benefits are governed by Title XVI, 42 U.S.C. § 1381 *et seq.*, of the SSA.   In addition, numerous regulatory provisions govern SSI benefits.  *See* 20 C.F.R. Pt. 416 (2013). The SSA defines a "disability" as a "medically determinable physical or mental impairment" lasting at least twelve months that prevents the claimant from engaging in "any substantial gainful activity."  42 U.S.C. §§ 423(d), 1382c(a)(3)(A); *see McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999).

To determine whether a claimant is disabled, and thus entitled to benefits, a five-step analysis is employed.  20 C.F.R. § 416.920(a)(4).  First, the claimant must not be presently working at any substantial gainful activity.  *Id.* § 416.920(b).  "Substantial gainful activity" is defined as work activity "that involves doing significant physical or mental activities . . . for pay or profit."  *Id.* § 416.972.  Second, the claimant must have an impairment or combination of impairments that is severe.  *Id.* § 416.920(c); *see also Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985), *cited in Loza v. Apfel*, 219 F.3d 378, 392 (5th Cir. 2000).  Third, disability will be found if the impairment or combination of impairments meets or equals an impairment contained in the Listing of Impairments ("Listing"), 20 C.F.R. Pt. 404, Subpt. P, App. 1.  20 C.F.R. § 416.920(d).  Fourth, if disability cannot be found on the basis of the claimant's medical status alone, the impairment or impairments must prevent the claimant from returning to his past relevant work.  *Id.* § 416.920(f).  And fifth, the impairment must prevent the claimant from doing any work, considering the claimant's residual functional capacity, age, education, and past work experience.  *Id.* § 416.920(g); *Crowley v. Apfel*, 197 F.3d 194, 197–98 (5th Cir. 1999).

2

Before moving from the third to the fourth step of the inquiry, the Commissioner assesses the claimant's residual functional capacity ("RFC") to determine the most the claimant can still do notwithstanding his physical and mental limitations. 20 C.F.R. § 416.920(a)(4).   The claimant's RFC is used at both the fourth and fifth steps of the sequential analysis. *Id.* At step four, the claimant's RFC is used to determine if the claimant can still do his past relevant work. *Id.* § 416.920(e). At step five, the claimant's RFC is used to determine whether the claimant can adjust to other types of work. *Id.* At steps one through four, the burden of proof rests upon the claimant to show that he is disabled. *Crowley*, 197 F.3d at 198. If the claimant satisfies this responsibility, the burden shifts to the Commissioner to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. *Id.*

A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988).   Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id.* A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* This Court may neither reweigh the evidence in the record nor substitute its judgment for the Commissioner's, but will carefully scrutinize the record to determine if the evidence is present. *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000); *Hollis*, 837 F.2d at 1383.

## III.  ISSUES

Harney presents the following issues:

1.   Whether the ALJ's Listing discussion is based on substantial evidence;

2.   Whether the ALJ's credibility assessment in the decision contains errors of law and is based on substantial evidence; and

3.   Whether the decision should be remanded for the ALJ's failure to address the GAF scores in the record.

(Pl.'s Br. 1.)

## IV.  ALJ DECISION

In his March 22, 2010 decision, the ALJ concluded that Harney was not disabled within the meaning of the SSA. (Tr. 27.)  In making the determination, the ALJ proceeded to follow the five-step sequential evaluation process.  At the first step, the ALJ found that Harney had not engaged in any substantial gainful activity since November 10, 2008—the date of Harney's protective filing. (Tr. 20.)  At the second step, the ALJ found that Harney suffered from "bipolar I disorder, scoliosis, spondylosis, and obesity" and that such disorders were severe impairments under the SSA. (Tr. 20.)  At the third step, the ALJ found that Harney did not meet or equal in severity to an impairment contained in the Listing because her mental impairments did "not cause at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation, each of extended duration." (Tr. 21.)

The ALJ then assessed Harney's RFC as follows:

[Harney] has the residual functional capacity to lift and/or carry up to 10 pounds occasionally, with standing and/or walking no more than a total of 2 hours in an 8-hour workday, and sitting up to a total of 6 hours in an 8-hour workday.  She is further limited to no climbing of ladders, ropes, or scaffolds, no more than occasional climbing of ramps and stairs, and no more than occasional stooping, balancing, crouching, and crawling.  [Harney] is able to understand, remember, and carry out simple instructions and to use appropriate judgment to make simple work-related decisions.  She is able to maintain sufficient attention & concentration to perform simple repetitive tasks and adapt to the routine changes

> which accompany simple unskilled work.  She should have no more than
> incidental contact with coworkers and the general public.  In this environment,
> she could respond appropriately to instructions and criticism from supervisors.

(Tr. 22.)  Next, at the fourth step, the ALJ found that Harney had no past relevant work

performed at the level of substantial gainful activity to which she could return.  (Tr. 25.)  Finally,

at the fifth step, the ALJ opined that, based on Harney's RFC and on her age, education, and

work experience, Harney retained the ability to perform work existing in significant numbers in

the national economy and, thus, was not disabled and had not been disabled at any time through

the date of the decision.  (Tr. 26–27.)

## V.   DISCUSSION

### A.   Issue One: Was the ALJ's Listing Discussion Based on Substantial Evidence?

In her first issue, Harney challenges the ALJ's step three finding, which stated that she

did not have an impairment or combination of impairments that met or medically equaled one of

the impairments on the Listing.  (Pl.'s Br. 16–23.)  To be found disabled at step three, a claimant

must show that her impairments meet or equal one of the impairments in the Listing.  *Crowley*,

197 F.3d at 198 (holding that at steps one through four, the burden of proof rests upon the

claimant to show disability).  The ALJ is responsible for deciding the ultimate legal question of

whether the Listing is met or equaled at step three.  SSR 96-6p, 1996 WL 374180, at *3 (S.S.A.

July 2, 1996).  Whether a claimant's impairment meets the requirements of an impairment in the

Listing is usually more a question of medical fact than opinion because most of the requirements

are objective, "and whether an individual's impairment manifests these requirements is simply a

matter of documentation."  SSR 96-5p, 1996 WL 374183, at *3 (S.S.A. July 2, 1996).

In this case, the ALJ evaluated Harney's mental impairment at step three pursuant to the "technique"[1] and found that that Harney's impairments did not meet or equal the required criteria for any of the impairments listed under Section 12.04 of the Listing.[2] (Tr. 20.) To show the required level of severity under Section 12.04, Harney had the burden of proving that her bipolar disorder satisfied the "paragraph B" requirements of Section 12.04. *See* 20 C.F.R. Part 404, Subpt. P, App. 1, § 12.04(B).   Paragraph B requires a showing that Harney's bipolar disorder resulted in at least two of the following:

(1) Marked restriction of activities of daily living;

(2) Marked difficulties in maintaining social functioning;

(3) Marked difficulties in maintaining concentration, persistence, or pace; or

(4) Repeated episodes of decompensation, each of extended duration.

*Id.*  However, the ALJ found that Harney's bipolar disorder resulted in only (1) mild restriction of activities of daily living; (2) moderate difficulties in maintaining social functioning; (3) moderate difficulties in maintaining concentration, persistence, or pace; and (4) one to two repeated episodes of decompensation, but none for an extended duration.   (Tr. 21.)   Harney argues that these findings are not supported by substantial evidence. (Pl.'s Br. 17, 19, 21.)

---

[1] The "technique" is a set of mandatory steps that the regulations require an ALJ to follow when evaluating the severity of mental impairments in claimants. 20 C.F.R. § 416.920a(a). The ALJ first considers whether a claimant has a medically determinable mental impairment. See 20 C.F.R. Pt 404, Subpt. P, App. 1 § 12 .00; 20 C.F.R. § 416.920a(b)(l). The ALJ next must evaluate the degree of functional loss resulting from the claimant's mental impairments in four functional areas: 1) activities of daily living; 2) social functioning; 3) concentration, persistence, or pace; and 4) episodes of decompensation. 20 C.F.R. § 416.920a(c)(3): The degree of limitation in the first three functional areas is rated on a five-point scale, which includes none, mild, moderate, marked, and extreme. 20 C.F.R. § 416.920a(c)(4). The degree of the fourth functional area is rated on a four-point scale which includes none, one or two, three, and four or more. 20 C.F.R. § 416.920a(c)(4).

[2] Section 12.04 of the Listing addresses affective disorders, which includes bipolar disorder.  20 C.F.R. Part 404, Subpt. P, App. 1, § 12.04.

### 1. Activities of Daily Living

First, Harney claims that the ALJ's determination that she has a mild restriction in activities of daily living was not supported by substantial evidence. (Pl.'s Br. 19.) Here, the ALJ primarily relied on evidence contained in the report of the consultative examiner, Katherine S. Donaldson, Psy.D. ("Dr. Donaldson"). (Tr. 21, 243–49.) Based on Dr. Donaldson's report and Harney's own testimony, the ALJ determined that Harney "engages in a wide range of daily activities, which include attending to her personal care, caring for her two small children, ages 4 and 6 years, performing household chores such as cleaning and laundry, and preparing meals." (Tr. 21.)

Harney challenges the ALJ's finding by pointing to her own testimony and self-reports to medical sources that she was unable to care for her children or perform normal household chores without substantial assistance from others. (Pl.'s Br. 17.) Harney claims that evidence in the record shows that she was unable to provide day-to-day care for her children due to her thoughts of harming her children and due to her "daily periods of depressive decompensation" in which she slept or isolated herself in her room, leaving a "live in friend" in charge of watching over her children.[3] (Pl.'s Br. 5, 17–18.) Harney also claims that she was unable to do chores without the

---

[3] Much of the evidence cited by Harney consists of her own testimony at the hearing or self-reports on her disability application paperwork. (Tr. 50, 52–58, 67, 159–60.) Harney also cites medical records from late 2008 in which she reported that she "[felt] like she might hurt herself or her children" (Tr. 196) and heard voices telling her to hurt her mother and her children (Tr. 297). These auditory hallucinations resulted in her admission to Green Oaks hospital on December 5, 2008, where doctors concluded that she was "a danger to self as well as others." (Tr. 309.) Harney also cites admission paperwork from East Texas Medical Center dated January 9, 2012, indicating that she posed a "danger to self, others, and/or property due to behavioral manifestations of a mental disorder" and was experiencing suicidal ideations. (Tr. 892.)

However, as the ALJ observed in his decision, Harney responded to treatment with medication. (Tr. 24.) After her admission to Green Oaks hospital on December 5, 2008, Harney "responded well to medication as well as therapy" and was able to be discharged home after two days. (Tr. 309.) Upon discharge, Harney was "no longer experiencing auditory or visual hallucinations, no longer expressing suicidal or homicidal ideation. . . . The patient's mood has stabilized and patient has agreed to adequate outpatient care." (Tr. 310.) As for Harney's 2012 hospitalization, she had not been taking her medication for six weeks before being admitted to East Texas Medical Center on January 9, 2012. (Tr. 888.) After being admitted and stabilized on medication, Harney was discharged

assistance of her boyfriend and that she was unable to drive or leave her house alone, so she could not perform daily activities such as going to the post office, shopping, and banking.[4] (Pl.'s Br. 17–18.) Lastly, Harney claims that she could not maintain her daily hygiene without being reminded by others to do so.[5] (Pl.'s Br. 18.)

On the other hand, Dr. Donaldson's report states that Harney "eats breakfast with her children" and "is able to share in the household chores." (Tr. 246.) The report also states that Harney "enjoys riding horses and accompanying her children while they play outside." (Tr. 246.) Although noting that Harney "like[d] someone to talk to her or be near her when she [was] in the shower," Dr. Donaldson reported that "[Harney] is able to complete her daily self cares." (Tr. 246.) In addition, the medical record contains the opinion of state agency medical consultant Robert B. White, Ph.D. ("Dr. White"), which assessed Harney's restriction of activities of daily living as "mild." (Tr. 260.) Dr. White's opinion elaborates that the medical evidence of record shows that Harney "overall requires no special supervision – is able to travel in community unsupervised and care for children." (Tr. 262.)

At the hearing, Harney testified that on an average day, she gets up around seven a.m. to "make sure my daughter gets dressed and is ready for school." (Tr. 52.) Harney and a friend then take Harney's daughter to school. (Tr. 53.) Harney returns home, feeds her son breakfast and lunch, and naps and plays on the computer until Harney and her friend go to pick up

---

nine days later. (Tr. 889.) Upon discharge, Harney was "stable in terms of mood and behavior" and "denied suicidal or homicidal ideations." (Tr. 889.)

[4] Harney cites her own testimony at the hearing and her own self-reports on her disability application paperwork as evidence in support of her claim that she cannot perform normal household chores or leave the house. (Tr. 52–54, 55–57, 60.) Harney also points to a 2008 medical record documenting her self-reported complaint that she "has panic attacks while driving due to ptsd [sic]." (Tr. 195.)

[5] In support, Harney points to Dr. Donaldson's consultative examination record, which states, "[Harney] is able to complete her daily self cares, except that she claim that she cannot perform when she takes a shower, so she likes someone to talk to her or be near her when she is in the shower." (Tr. 246.) Harney also points to a March 5, 2010 medical record documenting her boyfriend's statement that, after Harney had stopped taking her medication, the boyfriend "had to get onto her for a while before she would take a shower the other day[,] and she'll wear the same shirt for a week and will go for a week without a shower." (Tr. 422.)

Harney's daughter from school. (Tr. 54–56.) Harney then cooks dinner, washes dishes, reads, and watches television. (Tr. 56.) Harney testified that she cleaned her home, including mopping, sweeping, and vacuuming, although vacuuming was "hard" for her because of the sound of the vacuum cleaner. (Tr. 56.) She agreed that she was able to clean and to cook for her children "[a]s long as it's at [her] own pace." (Tr. 57–58.)

In the decision, the ALJ cited Dr. Donaldson's consultative report and Harney's own testimony as evidence underlying his finding that Harney had only mild restriction of activities of daily living. (Tr. 21.) Harney argues that the ALJ's decision runs counter to the requirements of *Goodley v. Harris*, 608 F.2d 234, 236–37 (5th Cir. 1979), and *Singletary v. Bowen*, 798 F.2d 818, 823 (5th Cir. 1986), because the ALJ ignored uncontroverted evidence, did not consider or weigh the contrary evidence in the record, and cited only the portion of the evidence that allegedly supported his finding. (Pl.'s Br. 19.) As detailed above, however, the record contains many instances of conflicting evidence, and it is the ALJ's province to weigh the evidence and decide the ultimate legal question of whether the Listing is met or equaled at step three. *See* SSR 96-6p, 1996 WL 374180, at *3.

The ALJ made his findings "[a]fter careful consideration of the entire record" (Tr. 20), and this Court may neither reweigh the evidence in the record nor substitute its judgment for the Commissioner's. *Harris*, 209 F.3d at 417; *Hollis*, 837 F.2d at 1383. Instead, this Court's job is only to determine whether the record contains substantial evidence to substantiate the ALJ's claim. *Leggett*, 67 F.3d at 564; *Hollis*, 837 F.2d at 1382. The Court is satisfied that it does. Accordingly, the ALJ's finding is not subject to reversal, even though there may be substantial evidence in the record that would have supported the opposite conclusion, because substantial evidence also supports the conclusion that was reached by the ALJ. *See Dollins v. Astrue*, No.

4:08-CV-503-A, 2009 WL 1542466, at *5 (N.D. Tex. June 2, 2009) (citing *Steed v. Astrue*, 524 F.3d 872, 874 (8th Cir. 2008), and *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

### 2. Social Functioning

Next, Harney argues that the ALJ's determination that she had moderate difficulties in maintaining social functioning was not supported by substantial evidence. (Pl.'s Br. 21.) In his discussion of Harney's social functioning, the ALJ noted Harney's testimony at the hearing that Harney "has mood swings, but that she is primarily depressed and tends to isolate from others." (Tr. 21.) The ALJ also considered Harney's testimony "that she had problems getting along with coworkers in the past, but had no trouble getting along with supervisors." (Tr. 21.) On the other hand, the ALJ also noted that Harney reported to Dr. Donaldson that "she had a few people with whom she felt comfortable opening up and talking to." (Tr. 21, 246.) The ALJ reasoned that, because Harney had contact with family members and lives with her boyfriend and two children, she had the ability to sustain relationships with others. (Tr. 21.) Based on this evidence, the ALJ found that Harney had moderate difficulties in maintaining social functioning. (Tr. 21.)

Harney challenges the ALJ's finding by pointing out that the ALJ inaccurately stated in his decision that Harney testified that she "had no trouble getting along with supervisors." (Pl.'s Br. 19.) Rather, Harney testified that she had an altercation with her supervisor during her job as a waitress that resulted in her termination. (Tr. 43.) She also testified that she had "problems" getting along with supervisors and that any criticism would cause her to "end up curled up in the bathroom crying." (Tr. 66.) As for Harney's relationship with her coworkers, Harney testified that she was not friends with her coworkers and that they would not talk to her. (Tr. 62–63.) Harney argues that she has only two friends, her boyfriend and her live-in friend who helps her take care of her children, but that her relationship with her boyfriend is not good because of "his doubts of Harney's mental stability" and her homicidal ideations towards him. (Pl.'s Br. 20.)

Harney also claims that she did not get along with her mother and sister and was afraid to drive alone. (Pl.'s Br. 20–21.) Accordingly, Harney argues that she has marked difficulties in maintaining social functioning, and the ALJ's finding that she was only moderately limited in this area was not supported by substantial evidence. (Pl's Br. 21.)

Again, however, the ALJ's decision cites Dr. Donaldson's consultative report and Harney's own testimony as evidence supporting the ALJ's finding that Harney had only moderate difficulties in maintaining social functioning. (Tr. 21.) At the time of Dr. Donaldson's report, Harney and her children were living with her mother and stepfather. (Tr. 246.) Harney told Dr. Donaldson that she had "a good relationship with her children" and "maintan[ed] close contact with her biological father" but did "not feel close to her mother, step-father, and sister." (Tr. 246.) Harney testified at the hearing that she had moved from her mother's house to live with her boyfriend so that her daughter could attend better schools. (Tr. 51–52.) Accordingly, at the time of the hearing, Harney was living with her boyfriend, another friend, and her children. (Tr. 51–53.) And while Harney testified that she did not get along with supervisors and coworkers, she also testified that when she worked as a waitress, she "got along well and great" with other employees and that they "were friends." (Tr. 43.) Furthermore, Harney testified that there were customers who would request her to be their waitress. (Tr. 43.) And as the ALJ noted, Harney acknowledged to Dr. Donaldson that "she had a few people with whom she felt comfortable opening up and talking to," that she had contact with family members, and that she was living with her boyfriend and two children. (Tr. 21.) Furthermore, Harney responded to medication and treatment, and her complaints of harmful ideations resolved once she received medication and therapy. (Tr. 24, 198, 224, 248, 310, 889, 896.)

Accordingly, the record contains conflicting evidence, and it is the ALJ's province to weigh the evidence and decide the ultimate legal question of whether the Listing is met or

equaled at step three. *See* SSR 96-6p, 1996 WL 374180, at \*3. Again, this Court may neither reweigh the evidence in the record nor substitute its judgment for the Commissioner's, but may only determine whether the record contains substantial evidence supporting the ALJ's decision. *See Harris*, 209 F.3d at 417; *Leggett*, 67 F.3d at 564; *Hollis*, 837 F.2d at 1382–83. Accordingly, because the ALJ's finding that Harney had moderate difficulties in maintaining social functioning is supported by credible evidentiary choices, the Court finds that substantial evidence supports the ALJ's finding. *See Boyd*, 239 F.3d at 704; *Leggett*, 67 F.3d at 564; *Hollis*, 837 F.2d at 1382. The Court further finds that the ALJ did not violate the requirements of *Goodley* or *Singletary* because the ALJ considered and weighed the conflicting evidence in the record. *Goodley*, 608 F.2d at 236–37; *Singletary*, 798 F.2d at 823. Remand is not required, even though there may be substantial evidence in the record that would have supported the opposite conclusion, because substantial evidence also supports the conclusion that was reached by the ALJ. *See Dollins*, 2009 WL 1542466, at \*5.

### 3. Decompensation

Finally, Harney challenges the ALJ's finding that she had experienced one to two repeated episodes of decompensation, but none for an extended duration. (Pl.'s Br. 21.) Harney argues that that this finding is erroneous because the evidence shows that her episodes of decompensation were more numerous and severe. (Pl.'s Br. 22–23.)

The regulations define decompensation as follows:

> 4. *Episodes of decompensation* are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace. Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two). Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g.,

12

hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode.

The term *repeated episodes of decompensation, each of extended duration* in these listings means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks. If you have experienced more frequent episodes of shorter duration or less frequent episodes of longer duration, we must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence.

20 C.F.R. Part 404, Subpt. P, App. 1, § 12.00(C)(4). In his decision, the ALJ observed that Harney "underwent two brief psychiatric hospitalizations during the latter part of 2008. In both instances, her primary symptoms resolved with treatment." (Tr. 21.) Thus, the ALJ found that Harney had experienced only one to two episodes of decompensation, but none were of an extended duration. (Tr. 21.) This finding is consistent with the medical evidence, which shows that Harney was hospitalized for treatment of her bipolar disorder for three days in November 2008 and for two days in December 2008. (Tr. 218–30, 309–10.)

As Harney points out, she was hospitalized three times after the ALJ's decision: in March 2010 (Tr. 411–30), March 2011 (Tr. 895–99), and January 2012 (Tr. 888–94). Harney submitted medical records of these hospitalizations to the Appeals Council, so they are considered part of the record upon which the Commissioner's final decision is based. *Higginbotham v. Barnhart*, 405 F.3d 332, 337 (5th Cir. 2005). A court considering the Commissioner's final decision should review the record as a whole, including the new evidence, to determine whether the Commissioner's findings are supported by substantial evidence and should remand only if the new evidence dilutes the record to such an extent that the ALJ's decision becomes insufficiently supported. *Higginbotham v. Barnhart*, 163 F. App'x 279, 281–82 (5th Cir. 2006). The Court finds that this new evidence does not dilute the record because Harney's three additional hospitalizations did not occur within one year; thus, they do not meet the regulations' definition

13

of "*repeated* episodes of decompensation." 20 C.F.R. Part 404, Subpt. P, App. 1, § 12.00(C)(4) (emphasis added).

Finally, Harney argues that she experienced daily episodes of decompensation because she isolated herself in her bedroom sleeping or crying each day, thus requiring a "highly structured and directing household" consisting of "support and care" provided by Harney's boyfriend and live-in friend. (Pl.'s Br. 22.) Harney argues that these daily isolations constituted an "extended period of decompensation" from her onset date in November 2008 through at least the date of the hearing in November 2009. (Pl.'s Br. 22–23.) However, apart from Harney's own testimony, Harney cites no medical evidence in the record that documents the need for a more structured psychological support system. Thus, the Court is unconvinced that the duration and functional effects of Harney's daily isolations were of equal severity to the regulations' requirement of "repeated episodes of decompensation, each of extended duration." Accordingly, the ALJ's finding that Harney had experienced one to two repeated episodes of decompensation, but none for an extended duration, is supported by substantial evidence. *See Boyd*, 239 F.3d at 704). Because the ALJ's findings at step three are supported by substantial evidence in the record as a whole, remand on Harney's first issue is not required. *See Leggett*, 67 F.3d at 564; *Hollis*, 837 F.2d at 1382.

**B.      Issue Two: Did the ALJ's Credibility Assessment in the Decision Contain Errors of Law, and Was It Based on Substantial Evidence?**

In her second issue, Harney challenges the ALJ's finding that Harney's statements concerning the intensity, persistence, and limiting effects of her symptoms are not credible to the extent that they are inconsistent with the RFC assessment. (Tr. 23.) When medical evidence shows that a claimant has a medically determinable impairment that could reasonably be expected to produce the claimant's symptoms, the ALJ then must evaluate the "intensity and

persistence" of the claimant's symptoms to determine how the symptoms limit the claimant's capacity for work. 20 C.F.R. § 416.929(c)(1); *see also* SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). The ALJ must consider all of the available evidence, including (1) the claimant's history; (2) signs and laboratory findings; and (3) statements from the claimant, treating or nontreating sources, or other persons about how the symptoms affect the claimant. 20 C.F.R. § 416.929(c)(1).

The ALJ will consider various factors relevant to a claimant's credibility, including (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication that the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, that the claimant receives or has received for relief of pain or other symptoms; (6) any measures used to relieve pain or other symptoms; and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. *Id.* § 416.929(c)(1), (c)(3). "The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision." SSR 96-7p, 1996 WL 374186, at *4.

Harney complains that the ALJ's decision fails to discuss the abovementioned factors and "does not make it clear what weight the decision gave to Harney's statements [regarding the limiting effects of her symptoms] and reasons behind the weight given." (Pl.'s Br. 27.) The Court disagrees. Although the ALJ could have been more precise in setting forth the factors in section 416.929, it is clear from his decision that he did consider such factors. The ALJ stated in his decision that his rationale for his adverse credibility finding was that (1) Harney had responded to treatment with medication; (2) medical progress notes do not support the assertion that Harney is unable to perform all work activities; (3) Harney's activities of daily living are not

as restricted as one would expect, given her allegations of disabling depression and anxiety; and (4) the state agency consultant's opinion that Harney was able to perform work activities was entitled to significant weight. (Tr. 25.) The ALJ also noted the low GAF scores assessed by Dr. Donaldson and by Harney's treating doctor,[6] but he explained that he had given these scores little weight because they were inconsistent with other evidence in the record. (Tr. 25.) Harney disagrees with this rationale for several reasons.

First, Harney challenges the ALJ's observation that Harney had responded to treatment with medication. (Pl.'s Br. 24.) In his decision, the ALJ discussed Harney's two hospitalizations for treatment of her bipolar disorder in November and December 2008 and noted that Harney's symptoms had stabilized with medication treatment. (Tr. 24.) Harney complains that the ALJ's discussion fails to include her October 2008 hospitalization for bipolar disorder treatment, her "multiple, consistent low GAF scores," her three episodes of treatment at MedNow, and Dr. Donaldson's negative findings in the consultative report. (Pl.'s Br. 24.)

The medical record shows that Harney sought treatment for anxiety and mood swings at MedNow Family Medical Clinic ("MedNow") in October 2008. (Tr. 234–35.) She was diagnosed with anxiety and possible bipolar disorder, and MedNow referred her to Adapt of Texas mental health clinic ("Adapt") on October 29, 2008. (Tr. 234–35.) The next day, on October 30, 2008, Harney went to Navarro Regional Hospital's emergency room ("Navarro"), stating that she had been sent to Navarro by staff at Adapt for evaluation. (Tr. 195.) She was diagnosed with anxiety and depression and discharged the same day with instructions to follow up with Adapt or MedNow. (Tr. 198–99.) Harney returned to MedNow on November 5, 2008, "want[ing] to be tested for bipolar" and complaining that she had been to Adapt but "they

---

[6] The Global Assessment of Functioning (GAF) scale rates psychological, social, and occupational functioning on a scale of 0 to 100. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. text rev. 2000) [hereinafter "DSM-IV-TR"].

wouldn't listen to her" and that Adapt "put her on some meds that 'might make her brain swell.'" (Tr. 233.) MedNow gave Harney a referral to another mental health services provider and prescribed medication. (Tr. 233.) Harney's first admission to Green Oaks hospital followed the next day, November 6, 2008, and she was discharged on November 9, 2008. (Tr. 220–30.) Harney then returned to MedNow "want[ing] disability papers filled out," and a certified nurse practitioner completed a form "Medical Release/Physician's Statement" dated November 12, 2008, indicating that Harney was permanently disabled due to her bipolar disorder. (Tr. 232, 237.)

The Court finds that none of this medical evidence contradicts the ALJ's finding that Harney responded to treatment with medication. Even though Harney had been seeking treatment from MedNow, Adapt, and the Navarro Regional Hospital emergency room in the days leading up to her three-day treatment stay at Green Oaks hospital in November 2008, Harney admitted upon admission to Green Oaks hospital that she had been "noncompliant with her mood stabilizer" and occasionally abusing alcohol. (Tr. 221.) Harney required further treatment at Green Oaks hospital on December 5, 2008, but once her medication was changed and she received therapy, she "responded well" and her "mood [had] stabilized," and she was discharged two days later. (Tr. 309–10.) Furthermore, the MedNow nurse practitioner's statement that Harney was permanently disabled due to her bipolar disorder is entitled to no special significance because the determination of whether a claimant is disabled is a legal conclusion that is reserved to the Commissioner. *See* 20 C.F.R. § 416.927(d); *Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003). Accordingly, this evidence does not undermine the ALJ's credibility finding.

Similarly, the Court recognizes that Dr. Donaldson gave Harney a poor prognosis because Harney "had difficulty finding and maintaining employment as well as difficulty making appropriate occupational, personal, and social adjustments," and Dr. Donaldson also opined that

Harney would be unable to manage benefit payments in her own interest. (Tr. 249.) Harney claims that her self-reports regarding the limiting effects of her symptoms to Dr. Donaldson are consistent with her other self-reports at the hearing and to other medical providers, so this consistency demonstrates her credibility. (Pl.'s Br. 27.) But as discussed in Part V.A., *supra*, Dr. Donaldson's report also contained evidence that Harney was capable of performing activities of daily living and maintaining some social relationships. The ALJ found that Harney's activities of daily living "were not as restricted as one would expect, given her allegations of disabling depression and anxiety":

> She is able to perform household chores and cooking at her own pace, care for her small children, play computer games, read, and watch television. It is further noted that [Harney] reported to [Dr. Donaldson] that she enjoyed riding horses and accompanying her children while they played outside, an indication that [Harney] has interests and engages in activities that give her pleasure, contrary to her allegation of anhedonia.

(Tr. 25.) It is the ALJ's duty to evaluate the credibility and relative persuasiveness of the testimony, and this Court may neither make credibility determinations nor reweigh the evidence. *See Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999). It is the role of the Commissioner, and not the Court, to resolve conflicts in the evidence. *Id.* Thus, it was within the ALJ's province to weigh the evidence and make credible evidentiary choices, and the Court finds that the portions of Dr. Donaldson's report upon which Harney relies do not render the ALJ's credibility finding unsupported by substantial evidence.

Finally, the Court finds that, while GAF scores of 50 and below may serve as evidence of the severity of a claimant's symptoms, they do not cause the ALJ's credibility finding in this case to be unsupported by substantial evidence.[7] The ALJ noted that Harney's treating physician

---

[7] A GAF score of 41–50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR, *supra*, at 34.

at Adapt, Donald Milligan, M.D. ("Dr. Milligan"), as well as Dr. Donaldson both gave Harney a

GAF score of 50, and that this score indicated "severe symptoms." (Tr. 25.) However, the ALJ

gave these scores "little weight" because it appeared to the ALJ that Dr. Donaldson "based the

score on [Harney's] self reported symptoms, which are not reflected in Dr. Milligan's notes,"

and because Dr. Donaldson had performed her assessment within only three weeks of Harney's

December 2008 hospitalization at Green Oaks hospital. (Tr. 25.) The ALJ also believed that Dr.

Milligan's progress notes were "inconsistent with a GAF of 50, as [Harney's] symptom level

was generally reported as no greater than 3/10." (Tr. 25.)

Harney disagrees, arguing that Dr. Milligan's notes indicate that her medication was only

partially effective and that her functioning was only rated as 6/10, despite her consistent

compliance with her medication regimen. (Pl.'s Br. 25–26.) Regardless, the Court notes that a

GAF score is not determinative of a claimant's ability to work. *See Fuller v. Astrue*, No. 4:09-

CV-197-A, 2010 WL 5566819, at *8 (N.D. Tex. Oct. 13, 2010), *adopted in* 2011 WL 94549

(N.D. Tex. Jan. 11, 2011). Federal courts have specifically declined to find a link between a

claimant's GAF score and the ability or inability to work. *See* 65 Fed. Reg. 50746, 50764–65

(Aug. 21, 2000) (declining to endorse the GAF scale for use in Social Security and SSI disability

programs and stating that the GAF scale "does not have a direct correlation to the severity

requirements in our mental disorders listings"); *see also, e.g., Kennedy v. Astrue*, 247 F. App'x

761, 766 (6th Cir. 2007); *Wind v. Barnhart*, 133 F. App'x 684, 692 n.5 (11th Cir. 2005);

*Andrade v. Astrue*, No. 4:11-CV-318-Y, 2012 WL 1106864, at *10 (N.D. Tex. Feb. 13, 2012),

*adopted in* 2012 WL 1109476 (N.D. Tex. Apr. 2, 2012). In this case, the ALJ (1) properly

considered and discussed the evidence in the record in determining the extent to which Harney's

symptoms limited her capacity for work; (2) adequately explained the reasoning for his adverse

credibility finding and for giving less weight to certain evidence; and (3) exercised his

responsibility as a factfinder in weighing the evidence. *See* 20 C.F.R. § 416.929(c)(1); SSR 96-7p, 1996 WL 374186, at *1; 4; *see also Chambliss v. Massanari*, 269 F.3d 520, 523 (5th Cir. 2001) ("[T]he task of weighing the evidence is the province of the ALJ."). Consequently, the ALJ did not err, and remand is not required on Harney's second issue.

### C.   Issue Three: Should the Decision Be Remanded for the Failure to Address the GAF Scores in the Record?

In her third issue, Harney again emphasizes that she has been assessed with GAF scores of 50 and below by medical sources on multiple occasions, and she argues that these low GAF scores demonstrate that she is incapable of sustaining full-time employment. (Pl.'s Br. 28.) Harney complains that the ALJ did not include any limitations in her RFC assessment related to social and occupational functioning, and she argues that this omission requires remand pursuant to *Boyd v. Apfel*, 239 F.3d 698, 707 (5th Cir. 2001). The Court disagrees.

In *Boyd*, the ALJ posed a hypothetical question to the vocational expert ("VE") asking whether a person with nonexertional limitations relating to memory and concentration could still perform work in the national economy. *Id.* The Fifth Circuit determined that this hypothetical was deficient because there was uncontroverted evidence in the record showing that the claimant suffered from various additional limitations, including dealing with people, dealing with ordinary work stresses, and functioning independently in daily activities. *Id.* The court concluded that, as a result, the hypothetical did not "incorporate reasonably all disabilities of the claimant recognized by the ALJ." *Id.* Accordingly, the court held that the VE's testimony was insufficient to support the ALJ's decision and remand was required. *Id.*

Here, however, the ALJ did incorporate nonexertional limitations pertaining to Harney's bipolar disorder in the RFC assessment, including limitations relating to her social and occupational functioning as follows:

> [Harney] is able to understand, remember, and carry out simple instructions and to use appropriate judgment to make simple work-related decisions. She is able to maintain sufficient attention & concentration to perform simple repetitive tasks and adapt to the routine changes which accompany simple unskilled work. She should have *no more than incidental contact with coworkers and the general public. In this environment, she could respond appropriately to instructions and criticism from supervisors.*

(Tr. 22) (emphasis added). The ALJ also incorporated limitations relating to Harney's social and

occupational functioning in the hypothetical posed to the VE as follows:

> Q [ALJ] All right. I want you to assume an individual Ms. Harney's age, education, and work background. . . . She has some limitations with her mental functions as well. She'd be limited to understanding, remembering, and carrying out simple job instructions using appropriate judgment, make simple work-related decisions. And [INAUDIBLE] concentration and perform simple, repetitive tasks and adapting only root and change [phonetic] [INAUDIBLE] work. *Have no more than minimal or incidental contact with coworkers, general public. This question would define that in some work-related environments be able to respond appropriately to [INAUDIBLE] criticism from supervisors.*

(Tr. 73–74) (emphasis added) (brackets in original). Although Harney argues that the degree of

her social and occupational limitations was more severe than that found by the ALJ, Harney does

not point out any additional limitations that the ALJ recognized but failed to incorporate in his

RFC assessment.[8] And while Harney may believe that the ALJ should have assessed more

restrictive limitations, the record contains conflicting evidence on the extent to which Harney's

---

[8] Harney claims that the VE testified that a person with a GAF score of 50 would not be able to work. (Pl.'s Br. 31.) However, the transcript is far from clear on this issue, as the following testimony demonstrates:

> Q [Harney's attorney] . . . I have one question. Are there any unskilled occupations that can be performed by somebody with a sustained, global assessment of function with 50 or less?
> A [VE] Based on that scaled [sic] typically of 50 or less is where the claimant have [sic] [INAUDIBLE] functioning.

(Tr. 77.) Furthermore, the VE then elaborated on the utility of GAF scores in the vocational context as follows:

> A [VE] . . . And again, those scales are - - we don't typically go strictly by those scales.
> Q [ALJ] Right. That's just one - - [INAUDIBLE].
> A Correct. Based [sic] it on just the actual restrictions.

(Tr. 77.) Thus, even though the entirety of the VE's testimony regarding GAF scores of 50 or less is unclear from the transcript, what is clear from the VE's testimony is that a GAF score of 50 or less does not automatically render a claimant unable to work. Rather, the VE's testimony indicates that it is the "actual restrictions" posed by a claimant's impairment that determines the extent of the claimant's ability to perform work-related activities. (Tr. 77.)

bipolar disorder limited her functioning. This conflicting evidence distinguishes Harney's case from *Boyd*, in which remand was necessary based on uncontroverted evidence of limitations that were not included in the hypothetical posed to the VE. *See* 239 F.3d at 707. Thus, *Boyd* does not require remand under the facts of this case.

The Court recognizes that GAF scores of 50 and below indicate "serious" symptoms. DSM-IV-TR, *supra*, at 34. Similarly, the ALJ acknowledged that the GAF scores of 50 contained in Harney's medical records "indicat[ed] severe symptoms." (Tr. 25.) Again, however, a GAF score of 50 does not automatically render a claimant unable to work. *See Fuller*, 2010 WL 5566819, at *8; 65 Fed. Reg. at 50764–65; *Kennedy*, 247 F. App'x at 766; *Wind*, 133 F. App'x at 692 n.5; *Andrade*, 2012 WL 1106864, at *10. In fact, "a low GAF score is not determinative of a disability." *Nickerson v. Astrue,* No. 3:07-CV-921-BD, 2009 WL 321298, at *5 (N.D. Tex. Feb. 6, 2009). Furthermore, "while a GAF score may be of considerable help to the ALJ in formulating the RFC, it is not essential to the RFC's accuracy." *Hayes v. Commissioner*, No. 3:11-CV-1998-L, 2012 WL 4442412, at *18 (N.D. Tex. July 30, 2012), *adopted in* 2012 WL 4442411 (N.D. Tex. Sept. 26, 2012). Rather, the ALJ must consider the "total limiting effects" of a claimant's impairments on the claimant's ability to perform work activity on a regular and continuing basis. 20 C.F.R. § 416.945. As discussed above, the task of weighing the evidence lay with the ALJ, and the ALJ properly exercised his responsibility as a factfinder. *See* 20 C.F.R. § 416.929(c)(1); SSR 96-7p, 1996 WL 374186, at *1; 4; *Chambliss*, 269 F.3d at 523. Consequently, remand on Harney's third issue is not required.

## RECOMMENDATION

It is recommended that the Commissioner's decision be affirmed.

## NOTICE OF RIGHT TO OBJECT TO PROPOSED
## FINDINGS, CONCLUSIONS, AND RECOMMENDATION
## AND CONSEQUENCES OF FAILURE TO OBJECT

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions, and recommendation within fourteen (14) days after the party has been served with a copy of this document. The United States District Judge need only make a de novo determination of those portions of the United States Magistrate Judge's proposed findings, conclusions, and recommendation to which specific objection is timely made. *See* 28 U.S.C. § 636(b)(1). Failure to file by the date stated above a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).

## ORDER

Under 28 U.S.C. § 636, it is hereby **ORDERED** that each party is granted until August _28_, 2013, to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions, and recommendation. It is further **ORDERED** that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

It is further **ORDERED** that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions, and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED August _14_, 2013.

JEFFREY L. CURETON
UNITED STATES MAGISTRATE JUDGE